DENNIS K. RUSSELL and ANNETTE B. RUSSELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Russell v. Commissioner
Docket No. 35031-86
United States Tax Court
T.C. Memo 1990-217; 1990 Tax Ct. Memo LEXIS 236; 59 T.C.M. (CCH) 492; T.C.M. (RIA) 90217; April 26, 1990, Filed Decision will be entered under Rule 155. W. Kent Robertson, for the petitioners. Janice Chenier Taylor, for the respondent. JACOBS, Judge. JACOBS
*708 MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency in petitioners' 1982 income tax in the amount of $ 9,959, as well as an addition to tax under section 6653(a)(1) [1] in the amount of $ 498. Except for minor amounts, the deficiency arises due to respondent's reduction of a deduction claimed by petitioners on their joint tax return with respect to Dennis K. Russell's pro-rata share of an operating loss of Diagnostic Services, Inc. (DSI), a small business corporation electing to be a subchapter S corporation. Because of concessions by respondent, the only issue remaining for decision is whether Dennis K. Russell's adjusted basis in his stock in DSI may be increased to reflect his guarantee of third party loans to the corporation. We hold it may not be so increased. FINDINGS OF FACT Some of the facts have been *237 stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. Dennis K. Russell (petitioner) and Annette B. Russell, husband and wife, resided in Metairie, Louisiana, at the time they filed their petition in this case. DSI, incorporated in the State of Louisiana on February 24, 1981, was organized by petitioner (an attorney) and five doctors to provide nuclear medicine testing and CAT Scan testing. Petitioner and the five doctors each initially contributed $ 10,000 to DSI in exchange for 100 shares of its common stock, giving each a one-sixth ownership interest in the corporation. Petitioner was the business manager of DSI. *709 Shortly after its incorporation, DSI filed an election under section 1372(a) to be treated as an "electing small business corporation" for income tax purposes; all of its shareholders consented to such election. Upon commencement of business in 1981, DSI was in need of funds for equipment purchases (a Raytheon gamma camera and an MDS computer) and operating capital. To this end, petitioner negotiated on behalf of DSI to borrow $ 250,000 from First City Bank of New Orleans (FCB). Ultimately, the negotiations *238 led to an agreement (the terms of which were summarized in a commitment letter dated July 27, 1981) by FCB to lend DSI the requested amount conditioned upon the shareholders of DSI agreeing to both guarantee the loan and assign to FCB insurance policies of $ 50,000 each on their lives. On August 20, 1981, DSI and its shareholders accepted the terms and conditions set forth in the commitment letter. On January 5, 1982, FCB loaned $ 250,000 to DSI. The loan was evidenced by a note (the FCB note) signed by all six shareholders on behalf of DSI; each shareholder individually signed a Continuing Guaranty for the full amount of the loan. The loan was further secured by a chattel mortgage on the equipment purchased with the loan proceeds, as well as the aforementioned assignment of insurance policies of $ 50,000 each on the lives of DSI's six shareholders. In 1982, DSI purchased a CAT Scan machine and other equipment from Picker International, Inc. (Picker) for $ 1,515,206.40; the purchase price was financed by CIT Financial Services, Inc. (CIT). As a condition of CIT's agreement to finance DSI's purchase of the equipment, Picker was required to guarantee DSI's debt to CIT. Picker agreed *239 to do so on the condition that DSI's shareholders guarantee payment to Picker in the event Picker had to make payment under its guarantee to CIT. Petitioner and four of the five other shareholders of DSI agreed to so hold Picker harmless; and on April 4, 1982, they executed a Guarantee of Payment pursuant to which each agreed to be responsible for one-fifth of any amount Picker had to pay CIT in the event of a default by DSI. For their guarantee to Picker, petitioner and the four shareholder-guarantors each received 1,500 shares of DSI common stock. The lone shareholder of DSI who did not execute the guarantee was given the right to purchase 1,500 shares of DSI common stock, but he declined to do so. DSI carried both the FCB and CIT loans on its books as corporate obligations. It made the principal and interest payments on these loans and claimed a deduction (on its 1982 tax return) for the interest paid. DSI also paid the premiums of the life insurance policies assigned to FCB. Petitioner did not treat DSI's payment on the loans or its payment of the premiums on the insurance policy on his life as constructive income taxable to him. He was not called upon to repay either loan *240 in 1982. In a separate transaction, petitioner loaned $ 5,000 to DSI in October 1982. On its 1981 tax return (Form 1120S), DSI reported a loss of $ 37,418, of which petitioner's share was $ 6,237. Petitioners deducted their share of the loss on their joint 1981 tax return. In 1982, DSI reported a loss of $ 273,122, which amount is not in dispute. Petitioners deducted $ 52,588 as their share of said loss on their 1982 tax return. Petitioner calculated his basis in DSI as follows: Initial stock investment in 1981
$  10,000 (100 shares of stock)
1981 DSI pass-through loss
(    6,237)
Basis at 1/1/82
3,763 Loan to DSI in 1982
5,000 Loan to DSI through First City Bank
41,667 in 1982 (1/6th)
Equity investment Picker loan in 1982
(1/5th) (1,500 shares of stock)
303,041 Basis at 12/31/82
353,471 1982 DSI pass-through loss
(   52,588)
Basis at 1/1/83
$ 300,883 Respondent determined petitioner's basis in DSI as follows: Initial stock investment in 1981
$ 10,000 1981 DSI pass-through loss
(   6,237)
Basis at 1/1/82
3,763 Loan to DSI in 1982
5,000 Basis at 12/31/82
$  8,763 Respondent reduced the amount of the claimed deduction for petitioners' share of DSI's loss for 1982 to the extent it exceeded petitioner's *241 basis (as determined by respondent) in DSI; that is, respondent disallowed $ 43,825 of the claimed $ 52,588 loss deduction ($ 52,588 - $ 8,763 = $ 43,825). OPINION Effective for tax years beginning before January 1, 1983, former section 1374 [2] *242 *243 permitted a shareholder of an electing small business corporation *710 to deduct his portion of the corporation's net operating loss from his gross income. The amount of the deduction is limited to the sum of (a) the adjusted basis of the shareholder's stock in the corporation and (b) the adjusted basis of any indebtedness of the corporation to the shareholder. Section 1374(c). Petitioner argues that he (as well as each of the other shareholders of DSI) was a "maker in solido" with DSI of the loans from FCB and CIT (through Picker). In this regard, he contends that by virtue of his being bound in solido for the full debt of DSI to FCB and CIT, he and the other shareholders were the real makers of the loans. We disagree. The funds from both the FCB and CIT loans flowed directly to DSI. The loan documentation names DSI (and not its shareholders) as the maker. DSI (and not its shareholders) made all of the payments on the loans, and DSI took interest deductions for such payments. Both loans were carried on DSI's books as corporate obligations rather than as equity investments of, or indebtedness owed to, DSI's shareholders. *244 The FCB note was signed by DSI's shareholders on behalf of the corporation, not in their individual capacity and not as makers of the note. Although the promissory note in the CIT transaction was signed by DSI and five of its six individual shareholders, the Guarantee of Payment signed by the shareholders (which protected Picker in the event it had to make payment under its guarantee to CIT), as well as the chattel mortgage, clearly indicate that the loan from CIT was made to DSI. Petitioner's guarantees did not require any capital outlay on his part during the year in issue. Without any capital outlay, petitioner cannot increase his adjusted basis in his DSI stock. See , affd. , cert. denied U.S. , . Notwithstanding the lack of economic outlay on petitioner's part, citing , and , affg. a Memorandum Opinion of this Court, petitioner alternatively argues he is entitled to increase his basis in DSI for his share of the guaranteed debt pursuant to a debt-equity *245 analysis. In this regard, petitioner contends that the loans to DSI were, in substance, loans made to the shareholder-guarantors followed by an advance to the corporation. In , we rejected a similar argument that debt-equity principles permitted a shareholder's guarantee of a loan made to the subchapter S corporation to be treated as an equity investment. We held in that case that "a shareholder's guarantee of a loan to a subchapter S corporation may not be treated as an equity investment in the corporation absent an economic outlay by the shareholder." . Here, petitioner and the other shareholders of DSI made no payments on their guarantees. As we said in : "No form of indirect borrowing, be it guaranty, surety, accommodation, comaking or otherwise, gives rise to indebtedness from the corporation to the shareholders until and unless the shareholders pay part or all of the obligation." Petitioner asserts that Selfe, an Eleventh Circuit decision which relied on Plantation Patterns, a Fifth Circuit decision, would be *711 applicable precedent in the *246 Fifth Circuit. Again, we disagree. Selfe involved an appeal from the District Court's granting summary judgment in favor of the government and the dismissal of the taxpayer's refund suit. The issue before the District Court was whether a shareholder could increase the adjusted basis of her stock in a subchapter S corporation (in order to maximize her loss deduction under section 1374) by the amount of corporate debt which she guaranteed. The Eleventh Circuit remanded the case to the District Court for a determination as to whether the lender looked primarily to the shareholder for repayment of the debt. The Eleventh Circuit said: At issue here, however, is not whether the taxpayer's contribution was either a loan to or an equity investment in Jane Simon, Inc. The issue is whether the taxpayer's guarantee of the corporate loan was itself a contribution to the corporation sufficient to increase the taxpayer's basis in the corporation. In most cases, a mere guarantee of a corporate debt is insufficient, absent subrogation, to increase a taxpayer's basis. * * * []. The Eleventh Circuit suggested that debt-equity principles should be applied to determine whether the *247 lender loaned money to the shareholder of the subchapter S corporation or to the corporation. The Fourth Circuit in Estate of Leavitt v. Commissioner noted its disagreement with the Eleventh Circuit's suggestion. We agree with the Fourth Circuit in this regard; even so, the record herein does not support a finding that the lenders were looking primarily to the shareholder-guarantors for repayment. In , affg. , the Fifth Circuit agreed that when a shareholder merely guarantees a debt of his subchapter S corporation there is no increase in his adjusted basis in the corporation's indebtedness to him within the meaning of section 1374(c)(2)(B). Thus, the rationale expressed in Underwood, rather than that of Selfe, would serve as the applicable precedent in deciding the issue involved herein in the Fifth Circuit. [3] *248 In conclusion, we hold that the FCB and CIT loans were not, in fact or substance, made to DSI's shareholders. Such loans were neither capital contributions nor indebtedness of DSI to its shareholders. Consequently, petitioner is not entitled to include his proportionate share of such loans in his stock basis under sections 1374(c)(2)(A) or (B). To reflect the foregoing and concessions made by respondent, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 as in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Former section 1374 provides in relevant part: SEC. 1374. CORPORATION NET OPERATING LOSS ALLOWED TO SHAREHOLDERS. (a) GENERAL RULE. -- A net operating loss of an electing small business corporation for any taxable year shall be allowed as a deduction from gross income of the shareholders of such corporation in the manner and to the extent set forth in this section. (b) ALLOWANCE OF DEDUCTION. -- Each person who is a shareholder of an electing small business corporation at any time during a taxable year of the corporation in which it has a net operating loss shall be allowed as a deduction from gross income, for his taxable year in which or with which the taxable year of the corporation ends, * * * an amount equal to his portion of the corporation's net operating loss (as determined under subsection (c)). * * * (c) DETERMINATION OF SHAREHOLDER'S PORTION. -- (1) IN GENERAL. -- For purposes of this section, a shareholder's portion of the net operating loss of an electing small business corporation is his pro rata share of the corporation's net operating loss * * *. (2) LIMITATION. -- A shareholder's portion of the net operating loss of an electing small business corporation for any taxable year shall not exceed the sum of -- (A) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of the shareholder's stock in the electing small business corporation, * * *, and (B) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of any indebtedness of the corporation to the shareholder, determined as of the close of the taxable year of the corporation * * * In 1982, Congress revised the rules pertaining to subchapter S corporations in the Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669. The revisions in the 1982 Act apply to taxable years beginning after Dec. 31, 1982; hence, such revisions are not applicable to this case. Sec. 6(a), Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669, 1697. The limitations provided in former sec. 1374(c)(2) were reenacted by sec. 2 of the Subchapter S Revision Act of 1982, in sec. 1366(d)(1). Sec. 1366(d)(1) is currently in effect.↩
3. Fifth Circuit decisions serve as precedent to the Eleventh Circuit if rendered prior to October 1, 1981. . The reverse is not true. Contrary to petitioner's contention, decisions of the Eleventh Circuit do not serve as applicable precedent to the Fifth Circuit.